**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

CARRIE ALLEN SPECK, *et al*.                                            **PLAINTIFFS**

V.                                                                                  **CASE NO. 2:08CV95**

DESOTO COUNTY, MISSISSIPPI, *et al*.                          **DEFENDANTS**

*CONSOLIDATED WITH*

JOHN ANDREW MANNING                                              **PLAINTIFF**

V.                                                                                  **CASE NO. 2:10CV51**

DESOTO COUNTY, MISSISSIPPI, *et al*.                          **DEFENDANTS**

## MEMORANDUM OPINION

This cause comes before the court on the defendants' motions [88, 92, 110] for summary judgment based on the doctrine of qualified immunity. The plaintiffs have responded in opposition. The court has reviewed the briefs and submissions and is prepared to rule.

On June 6, 2008, plaintiffs Carrie Allen Speck, Barbara Allen Sitler, Ronald Chet Allen, and the Estate of Cayce Allen filed a lawsuit against defendants DeSoto County, James Albert Riley, Jane Thompson, Darby Roach, Lisa Davis, Jerry M. Davis, and other defendants for the wrongful death of Cayce Allen in violation of the Mississippi Wrongful Death statute and 42 U.S.C. § 1983. The individual plaintiffs are the immediate family members and wrongful death beneficiaries of Cayce Allen. On April 1, 2010, plaintiff John Andrew Manning, brother of the decedent, filed a separate wrongful death lawsuit against defendants. These two causes of action were consolidated on August 30, 2010, with the original lawsuit functioning as the lead case. Lisa Jackson, sister of the decedent, was added as a plaintiff in the consolidated case on October

7, 2010. On March 28, 2011, Lisa Davis was terminated as a defendant. The remaining individual defendants move for qualified immunity in their individual capacities.

<u>FACTS</u>

While incarcerated as a pretrial detainee on August 8, 2007, Cayce Allen committed suicide in a DeSoto County Jail cell. Earlier that evening, on August 7, 2007, Allen was arrested by members of the Hernando Police Department. They administered an intoxilyzer examination and charged her with driving under the influence (DUI). After the arrest, members of the Hernando Police Department observed Allen become emotional and voice thoughts of suicide. Police officers noticed that Allen had generally calmed down by approximately 12:30 a.m. on August 8, when Officers Pieh and Spooner turned custody over to DeSoto County booking officer Jane Thompson. A factual dispute exists regarding exactly what information was communicated to defendant Thompson versus what Thompson said she heard regarding Allen's suicide threats, but it is established that police officers notified Thompson of their concern for Allen. Officer Pieh testified that he told Thompson that Allen stated that her "life was over" and that she was going to kill herself and that Allen needed to be watched, while Officer Spooner testified that he told Thompson that Allen had been to Lakeside for suicidal behavior and she needed to be watched. Deposition of Pieh, p. 32-33; Deposition of Spooner, p. 24. Thompson testified that she was told to watch Allen because "she could try to hurt herself." Deposition of Thompson, p. 9.

Defendants Jane Thompson, Darby Roach, and Jerry Davis were officers of the DeSoto County Jail present and on duty during these events. Thompson was the booking officer who spoke with the police officers as they turned custody of Allen over to the DeSoto County Jail. Roach was a sergeant at the jail, and Davis was a jail officer. Neither Roach nor Davis talked

with the police officers. Thompson testified that she told both Roach and Davis they needed to watch Allen. Although Davis heard Thompson tell him that they needed to keep an eye on Allen, Roach claims he did not hear any comment along these lines. Defendant James Albert Riley was the Sheriff of DeSoto County. He was not at the jail at any time during or immediately following the events described.

Thompson claims to have kept a heightened watch on Allen. However, Thompson did not initiate a formal suicide watch. Allen was placed in a holding cell with her belt, leather bracelet, and shoelaces. At approximately 1:57 a.m., Allen was removed from the holding cell to be booked by Thompson. During an interview and medical screening, Allen answered in the negative to questions regarding suicidal tendencies and psychiatric care. After Allen was booked into the facility around 2:04 a.m., she was placed in a holding cell located in the booking area less than 10 feet from Thompson's chair. The cell door had a small rectangular viewing window. A large window on the same wall as the cell door was completely obscured by closed venetian blinds.

Thompson alleges she maintained a constant visual on Allen and that Allen generally stood in the window of her cell door. Thompson testified that after 3:00 a.m., when she had not seen Allen in about five minutes, she asked Sergeant Roach to check on her. There is evidence that Roach was visiting his girlfriend in the juvenile detention facility while Allen was being booked into the adult facility and afterwards. Employee Ellen Myers observed a "distress call" placed through Radio to Roach from Thompson requiring immediate assistance. These calls continued several times before Roach responded. At approximately 3:19 a.m., Roach found Allen hanging from the sprinkler head in her cell by her shoelaces and threads from her leather

belt. Cardiopulmonary resuscitation continued until emergency medical services personnel arrived, but efforts to revive were unsuccessful.

Though the DeSoto County Jail had a written suicide policy intended to address the appropriate actions to be taken by jail personnel when an inmate either committed suicide or attempted suicide and defendants Thompson, Roach, and Davis completed an approximately two week long certification course provided by the state of Mississippi that included suicide prevention training, these defendants had never seen a written policy on suicide prevention or been trained by DeSoto County officials on suicide prevention during their employment at the DeSoto County Jail. No other written guidelines existed regarding how to handle a suicide threat, though there were several verbal policies regarding suicide. According to defendant Davis, there was a policy dealing with detainees at risk for suicide who were held on a writ or order of the court. Roach noted a policy by which jail officers were required to take the detainee's belt and shoelaces away before placing the detainee in an isolation cell. Thompson alleged that only a supervisor could implement an official suicide watch, but had a watch been implemented, an officer would have visited the detainee every fifteen minutes, dressed the detainee in a jumpsuit, placed the detainee in an isolation cell, and posted a suicide watch login sheet on the cell.

## LEGAL STANDARDS

I. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific

facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Substantive law determines what is material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir. 2007).

## II. Qualified Immunity Standard

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity reconciles two interests: the need to hold accountable those public officials who irresponsibly exercise their power and "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335 (1986). Moreover, granting qualified immunity provides "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985). It follows that the court should recognize a valid qualified immunity defense as early as possible during the proceeding. *Whiting v. Tunica Cnty*, 222 F. Supp. 2d 809, 815 (N.D. Miss. 2002).

In the context of qualified immunity, the burden of proof shifts to the plaintiff to establish that the defendant's alleged actions violated clearly established law. *Salas v. Carpenter*, 980 F.2d 29, 306 (5th Cir. 1992) (citation omitted). The test for qualified immunity consists of two inquiries: "(1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident." *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998). Qualified immunity applies even if the alleged conduct violates a constitutional right provided that the defendant's conduct was objectively reasonable. *Id.* In other words, law enforcement officials are entitled to qualified immunity even if they "reasonably but mistakenly commit a constitutional violation." *Whiting*, 222 F. Supp. 2d at 816 (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001)).

## **ANALYSIS**

### I. Plaintiffs Alleged a Clear Constitutional Violation

The court considers first whether the plaintiffs make a constitutional violation claim. *Hare*, 135 F.3d at 325. The plaintiffs allege a violation of Allen's constitutional right under the Due Process Clause of the Fourteenth Amendment to reasonable medical care during her confinement in the DeSoto County Jail. Specifically, the plaintiffs contend that defendant Thompson failed to provide medical and mental treatment, failed to properly monitor Allen, place her on suicide watch, monitor her, or remove harmful objects from her. Plaintiffs assert that defendants Roach and Davis violated the Due Process Clause by causing Allen to be

deprived of her right to reasonable medical care during her confinement. Finally, plaintiffs maintain that defendant Riley is liable for failure to train jail personnel in proper suicide watch procedures and that he was deliberately indifferent in failing to establish and maintain policies, practices and procedures for hiring, training, supervising and retaining qualified jail personnel.

Jail officials such as the defendants herein have a duty under the Fourteenth Amendment to adequately protect pre-trial detainees like Allen from known suicidal impulses. *Branton v. City of Moss Point*, 261 F. App'x 659, 661 (5th Cir. 2008). This constitutional right is violated if "they had actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Id.* (quoting *Hare*, 74 F.3d at 650). Plaintiffs have alleged a constitutional violation claim against defendants Thompson, Davis, and Roach, because they contend that these defendants were deliberately indifferent in violating Allen's due process rights to medical care. Regarding Sheriff Riley, deliberate indifference may be illustrated by failure to adequately train or failure to adopt suicide prevention policies. *Evans v. City of Marlin*, 986 F.2d 104, 107-08 (5th Cir. 1993). Because plaintiffs contended that defendants acted with deliberate indifference to Allen's Fourteenth Amendment rights, the plaintiffs have successfully alleged a clear constitutional violation.

II. Objective Unreasonableness of Defendants' Conduct in Light of Clearly Established Law

Under the second prong of the qualified immunity test, the court determines whether the defendant's conduct was "objectively unreasonable in light of his duty not to be deliberately indifferent." *Id.* at 396. For the plaintiffs to show that defendants' actions were objectively unreasonable, plaintiffs must establish that: 1) "the alleged violated constitutional [right was] clearly established" during the alleged violation, and 2) "the conduct of the defendants was objectively unreasonable in light of the then clearly established law." *Atteberry v. Nocona Gen.*

*Hosp.*, 430 F.3d 245, 256 (5th Cir. 2005) (quoting *Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir. 1999)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (U.S. 1987). As described earlier, the law establishes clearly that jail officers and sheriffs have a duty not to be deliberately indifferent to serious medical needs of pre-trial detainees. *See Hare*, 74 F.3d at 650. The court considers separately whether the plaintiffs have met their burden to demonstrate whether the defendants' conduct was objectively unreasonable in light of the law. Plaintiffs are required to demonstrate that all reasonable officials would agree that defendants' actions constitute a violation of a federally protected right. *See Whiting*, 222 F. Supp. 2d at 818.

A. <u>Thompson</u>

The touchstone of the qualified immunity analysis is "whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). A defendant is entitled to qualified immunity if reasonable public officials could differ on the whether the defendant's actions were lawful. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992).

Plaintiffs argue that there are genuine issues of material fact as to whether Thompson was objectively reasonable in her dealings with  Allen. They allege that Thompson gained actual knowledge of a substantial risk that Allen may commit suicide and that Thompson failed to take steps to insure Allen's safety. Plaintiffs claim that Thompson's actions or inactions manifest deliberate indifference to the risk of Allen's suicide.

Plaintiffs first contend that a reasonable jury could determine that Thompson gained substantial knowledge of Allen's risk of suicide. Thompson was present and on duty at the DeSoto County Jail when Allen arrived, and she spoke with the arresting officers who warned her of Allen's prior suicidal statements. The arresting officers informed Thompson that Allen stated "her life was over" and that Allen was going to kill herself. Moreover, they told Thompson that Allen had been to Lakeside for suicidal behavior and that she needed to be watched.

In response to plaintiff's assertion, Thompson claims that she did not have sufficient knowledge that Allen was at risk for suicide despite warnings she received from arresting officers Spooner and Pieh. Because she did not observe any of Allen's emotional or unusual behavior, Thompson claims she did not view Allen as a suicide risk. Thompson points to Allen's Medical History/Health History Profile as support for her belief. However, the Profile, filled out by Thompson during an intake screening, lacks affirmative responses to inquiries regarding suicidal tendencies and alcohol problems. The Profile is arguably incomplete as there is no indication of either suicidal tendencies or alcoholism despite the fact that Allen was brought to the jail on DUI charges. Thus, a reasonable jury could decide that Thompson gained substantial knowledge of Allen's risk of suicide.

In the court's view, a jury could reasonably conclude that the actions taken by Thompson in response to this knowledge were constitutionally inadequate. The court regards as particularly troubling the fact Allen was placed in a holding cell with the personal possessions she used to commit suicide. In the court's view, simply removing personal items which could potentially be used to commit suicide would have been a simple step, and it is very hesitant to state that the Fourteenth Amendment does not require that this rather minimal step be taken in response to

specific information regarding a serious and credible threat to the detainee's life. This is particularly true when considering the fact that the holding cell where Allen was kept lacked an observation camera, and the large venetian blinds were closed from the outside where Thompson was stationed.

In arguing that her actions did not demonstrate deliberate indifference, Thompson testified that she kept a constant vigil on Allen and instructed other officers to watch her. Thompson alleges that she observed Allen for approximately two hours, interviewed her regarding suicidal tendencies, and never heard direct threats from Allen. However, no documentation exists to show whether or how frequently any officers checked on Allen. Moreover, Allen was left unsupervised long enough to construct the noose with which she committed suicide. A reasonable jury, viewing these facts in the light most favorable to the plaintiffs, could determine that Thompson acted with deliberate indifference to Allen's substantial risk of suicide.

The court recognizes that this issue presents difficult issues, and it is cognizant of the Fifth Circuit's holding in *Branton*, where that court reversed a district court's denial of summary judgment in a case bearing some factual similarity to this one. In *Branton*, the Fifth Circuit held that qualified immunity barred claims arising out of the suicide of a detainee who had told arresting officers that "his life was going to be over and that [the officer] might as well shoot him." *Branton*, 261 F. App'x at 661. In concluding that the trial court erred in denying summary judgment, the Fifth Circuit in *Branton* wrote as follows:

> We find that Appellee has not presented sufficient evidence demonstrating that Appellants violated Branton's Fourteenth Amendment rights. In asserting that Appellants had actual knowledge of a substantial risk that Branton would commit

suicide, Appellee points to the following facts: (1) Branton's fight with the police officers; (2) Branton's comment that his arrest would cause him to "lose his job, home, and everything"; and (3) Branton's comment that "his life was going to be over and that [the officer] might as well shoot him."  But even accepting these facts as true, we conclude that this evidence does not demonstrate that Appellants had actual knowledge of a substantial risk of suicide. People who are violent to others often are not violent to themselves. Therefore, unsurprisingly, courts have not considered a detainee fighting with police officers as evidence that the detainee was suicidal. *See, e.g., Lambert v. City of Dumas*, 187 F.3d 931, 934, 937-38 (8th Cir.1999). While Branton also made comments indicating that he was exasperated with living, we do not believe that these off-hand, cavalier comments made by someone who was intoxicated so significantly alters the calculus that a reasonable jury could infer that Appellants had actual knowledge that there was a substantial risk that Branton would kill himself.  Accordingly, we find that the district court erred when it denied Appellants' motion for summary judgment.

*Id.*

While the fact pattern in *Branton* clearly bears some superficial similarity to the one herein, a closer review reveals the two cases to be distinguishable. As quoted above, the Fifth Circuit in *Branton* characterized the suicidal statements of the detainee in that case as being "off-hand, cavalier comments made by someone who was intoxicated."  In this case, by contrast, the arresting officer Spooner emphasized in his deposition testimony that he felt Allen's threats of

suicide to be very serious and that he took care to emphasize this to Thompson. Specifically, Spooner testified that:

> Q: Okay. Tell me, if you would, to the best of your recollection what, if anything, you told the booking officer, Jane Thompson, when you left the sally port from smoking with Cayce to the point you turned her over to their care, custody, and control.

> A: I remember exactly what I told her. Officer Pieh was the one who actually transferred custody to Officer Thompson. Officer Pieh made some kind of reference – I don't remember exact verbiage, but he advised her that she was suicidal and to keep an eye on her. That officer's response was "okay." That let me know that she heard and she understood, but I didn't feel that was enough to make her aware of how serious this person was. I'm sure they hear that every day. So I kind of touched her on the arm, and I said, "Hey, I said I've been talking to her. She's been to Lakeside." I don't – it's in – it's in here what I told her, the exact verbiage. She – I told them that she has previously been at Charter Lakeside for suicidal behaviors and attempts and that she did, in fact, need to be watched. I also told her that what I - what I've already told you earlier about how she had been a burden on her family and that she had thought about things, and I stressed to her the seriousness. And at that time, she made direct eye contact me and said "okay." And, and I really, you know – the message was delivered.

Spooner thus testified that he specifically emphasized to Thompson that the suicide threats made by Allen were, in his view, serious ones. Officer Pieh likewise testified in his deposition that he believed Allen's threats of suicide to be serious and that he relayed his concerns in that regard to Officer Thompson.

From reviewing Thompson's brief and deposition testimony, it is apparent that the issue of the validity of her qualified immunity defense is not simply (or even primarily) one of law, but also presents disputed fact issues appropriate for resolution by a jury. For example, Thompson testified as follows in her deposition:

Q Okay. All right. When Cayce was brought into the jail that night, were you provided any information that would lead you to believe she might be a suicide risk?

A: Not that she would be a suicide risk, no, sir.

Q: If you had been provided information that would lead you to believe that she may be at risk for killing herself or harming herself, what would be the policies and procedures that you would have had to follow?

A: If I had been informed that she was a suicide risk, the supervisor would have been notified, and he would have made – he or she would have made that determination on what needed to be done.

Q: Okay. And do you know, if you had so informed the supervisor, what the policies and procedures were in place as of that night for dealing with somebody who may attempt to kill themselves?

A: Most likely they would have been put on a fifteen-minute watch, and they would have been checked every fifteen minutes. All their items would have been taken from them, and they would have been dressed out in yellows.

[Thompson depo. At 8]. It is thus plain that there are genuine fact issues regarding exactly how definitively Thompson was warned of the risk that Allen might commit suicide, and this issue is

clearly a crucial one. It is within a jury's province to decide such disputed fact issues, and it would be improper for this court to even attempt to do so.

It is, frankly stated, difficult to reconcile Thompson's deposition testimony with that of Officer Spooner, and it seems likely that a jury will decide that one of these witnesses was being less than truthful in his or her deposition. Thompson did acknowledge later in her deposition that Officer Pieh had told her that Allen might "hurt herself," but there is clearly a factual disconnect between her deposition testimony and that of Officer Spooner. Moreover, as discussed in greater detail *infra*, Thompson's deposition also included testimony which, in the court's view, might reasonably be viewed by a jury as reflecting evasiveness on her part. If the jury should decide that Thompson was being untruthful or evasive in her deposition, then it may choose to view virtually all of her testimony, including that describing the actions she took *vis a vis* Allen, with skepticism. It is thus apparent that there are a number of significant fact issues in dispute relating to the validity of Thompson's qualified immunity defense in this case. The court concludes that if a jury should decide these fact issues adversely to Thompson, then it would be within its province to conclude that the defense of qualified immunity is unavailable to her.

The court does not reach this conclusion lightly, since it is well aware of the legal difficulties faced by plaintiffs in overcoming a qualified immunity defense in a case of this nature. Nevertheless, if a jury concludes that Thompson was, in fact, provided with clear and credible warnings that a threat to the life of a detainee existed, then a reasonable employee should have been aware that clearly established constitutional law required that effective steps be taken to preserve that life. Indeed, Thompson's deposition testimony suggests that she was, in fact, aware of the need to respond effectively to a genuine threat of suicide, and she specifically

listed different steps that she would have taken if a genuine suicide threat had been conveyed to her. In light of this testimony, it may be difficult for Thompson to argue at trial that the much more limited steps which she (allegedly) did take were adequate, in the event that the jury disbelieves her testimony regarding the warnings she was given.

One reasonable interpretation of the facts of this case, among others, is that Thompson was given clear and specific warnings that Allen was a suicide risk but that she nevertheless 1) only conveyed vague instructions to her co-workers to "keep an eye" on Allen and 2) failed to take additional steps, such as removing potentially harmful personal items, that Thompson herself acknowledged to be necessary in cases involving genuine suicide risks. If the jury should decide at trial that the testimony and proof establish these facts, then the court would be unable to conclude, as a matter of law, that Thompson did not demonstrate "plain incompetence" so as to potentially subject her to liability under federal law. It thus appears that this case largely boils down to fact issues regarding the credibility of Thompson's version of the events of this case, and it is clearly for a jury to decide these fact issues. Thompson's motion for summary judgment on the basis of qualified immunity will therefore be denied.


B. Davis and Roach

The court now turns to the qualified immunity motions filed by defendants Davis and Roach. In the court's view, the plaintiffs' claims against these defendants fail under the second prong of the qualified immunity analysis because their actions were not objectively unreasonable. For plaintiffs to prove that defendants' actions were objectively unreasonable, plaintiffs would have to show that defendants had knowledge of the suicide risk and responded with deliberate indifference. As to these particular defendants, however, the court concludes

that plaintiffs fail to show that they had sufficient knowledge of a serious risk of suicide so as to distinguish this case from *Branton*. In so concluding, the court is not suggesting that the actions of Davis and Roach in this case were exemplary, but the question in the qualified immunity context is whether their actions demonstrated the sort of "plain incompetence" as to properly subject them to personal liability under federal law.

Qualified immunity law seeks to prevent a situation whereby governmental employees might face personal financial liability for simply failing to perform their job duties in as competent and thorough a manner as they arguably should have. If the law were otherwise, then it is likely that far fewer individuals would be willing to undertake difficult public service jobs in the first place, particularly in areas as likely to give rise to litigation as law enforcement. The court is acutely aware of this fact, as well as of the Fifth Circuit's holding in *Branton*, and it is primarily the testimony of Officer Spooner which has persuaded it that fact issues exist regarding the qualified immunity defense asserted by Officer Thompson.

Unlike Thompson, however, Davis and Roach never communicated with the arresting officers who actually observed Allen's suicide threats, and, as to these defendants, the record does not contain evidence of the sort of clear, credible, and even emphatic warning which, a jury might reasonably find, was conveyed to Thompson by Spooner. Indeed, in her deposition, Thompson appeared hesitant to state that she conveyed any warning to Davis and Roach that Allen might attempt suicide, testifying that:

A: … I walked by the supervisor and the roaming officer on duty at that time and told them "They said we need to watch her."

Q: Okay. I missed that then, who was the supervisor?

A: That would have been Sergeant Darby Roach. …

Q: Okay. But my question is did you tell your supervisor, Officer Roach, that you had received information from a Hernando officer that this young lady might try to hurt herself.

A: They were standing at the door when the officer called me back to the door, so they knew I was talking to a Hernando officer.

Q: Right. So could you answer my question now please.

A: I thought I had already answered.

Q: Well, my question was –

A: When I came by, I told Sergeant Roach and Officer Davis "we need to watch her."

Q: Okay. And my question is: did you ever tell Officer Roach or Sergeant Davis that you had received information that this young woman may try to hurt herself?

A: It's Sergeant Roach and Officer Davis.

Q: Okay.

A: I told them together that we need to watch her.

Q: Okay.  Let me try this one – it's a simple yes or no, ma'am. Did you tell your supervisor that you had received information that this young lady may try to hurt herself?

A: I would have to say yes because I told them that we needed to watch her.


In the court's view, this testimony arguably demonstrates a certain degree of evasiveness on the part of Thompson, and it certainly does not establish a basis upon which the plaintiffs might overcome the qualified immunity defenses asserted by Davis and Roach.

As noted previously, Davis testified that he heard Thompson say that they needed to keep an eye on Allen, but Roach claims he did not hear any comment along these lines.  Even

assuming that both Davis and Roach were given and heard a warning to watch Thompson, the record does not suggest that they were given the same sort of credible and emphatic warnings of suicide which were, according to Officer Spooner, given to Thompson. Accordingly, the court concludes that Davis and Roach did not have sufficient knowledge of a credible risk of suicide to distinguish them from the defendants in *Branton*, and their motions for summary judgment will therefore be granted.

## C. Sheriff Riley

### i. Failure to Train

The court next addresses Sheriff Riley's qualified immunity motion as to the claims asserted against him in his individual capacity. In so doing, the court must take care not to confuse claims asserted against Riley individually with those asserted against him in his official capacity, which are essentially claims against the county itself (and which are not the subject of this particular motion). In the court's experience, allegations that a sheriff's general failure to train his deputies regarding a particular matter are generally raised in the context of official capacity claims against the county itself. In *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989), the U.S. Supreme Court made it difficult for plaintiffs to prevail on such official capacity claims based upon a failure to train theory, but plaintiffs have, in the court's experience, generally attempted to do so rather than proceed against a sheriff individually.

The plaintiffs make clear in their brief that they do, in fact, assert claims against Riley individually for failure to train his deputies regarding suicide prevention, but the court concludes that they fail to establish any basis for prevailing on these claims. In so concluding, the court

notes that it is well established that Sheriff Riley cannot be held liable under § 1983 "for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). However, under § 1983, a sheriff with no personal involvement in the conduct that led to the deprivation of a constitutional right is still liable if: (1) he failed to train or supervise the jail officers involved; (2) a causal connection exists between the sheriff's failure to train and the violation of the rights of the plaintiff; and (3) the sheriff's failure "constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson v. Upshur Cnty*, 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted). The required training is the "minimal training to detect 'obvious medical needs of detainees with known, demonstrable, and serious mental disorders.'" *Evans v. Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) (quoting *Burns v. City of Galveston*, 905 F.2d 100 (5th Cir. 1990)). Thus, officials are not required to "unerringly detect suicidal tendencies." *Evans*, 986 F.2d at 107 (quoting *Burns*, 905 F.2d at 100 (5th Cir. 1990)). In *Burns*, the court held that pretrial detainees were not entitled to an absolute right to a "complete psychological examination." *Burns*, 905 F.2d at 100. Therefore, the failure to train in "procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation." *Id.*

For plaintiffs to show that Riley acted with deliberate indifference, they must show "more than a single instance of the lack of training or supervision causing a violation of constitutional rights." *Thompson*, 245 F.3d at 459 (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998); *Thompkins*, 828 F.2d at 304-05). In general, this requires a demonstration of "at least a pattern of similar violations." *Thompson*, 245 F.3d at 459 (citing *Snyder*, 142 F.3d at 798). "[T]he inadequacy of training must be obvious and obviously likely to

result in a constitutional violation." *Thompson*, 245 F.3d at 459 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989); *Snyder*, 142 F.3d at 799).

Plaintiffs argue that because Allen had a right to adequate protection from known suicidal impulses, Sheriff Riley had a duty to adequately train his employees. The Plaintiffs assert that jail officers had no training or supervision as to suicide prevention; that Riley's failure to train or supervise them caused a violation of Allen's constitutional right to reasonable medical care; and that Riley's failure to train or supervise amounted to deliberate indifference. Sheriff Riley admits that he did not train his staff in suicide prevention; but he notes that the staff received training from the state during an approximately two week long certification course. Although Riley's employees received no training from the sheriff himself, Riley's employees knew the policies in place to handle known suicide risks. For example, even though Thompson did not act a formal suicide watch, she testified to knowing what to do if a suicide threat occurred. Further, to meet their burden, plaintiffs must show "more than a single instance" of this failure to train. *See Thompson*, 245 F.3d at 459. While Plaintiffs offer statistics of four prior suicides and at least twenty-three attempted suicides within DeSoto County Jail, they do not prove a causal connection between any of these earlier suicides and a lack of training. Plaintiffs' argument on this issue therefore lacks merit.

ii. Failure to Implement Adequate Policies

The plaintiffs allege that Riley failed to promulgate an adequate suicide prevention, inmate supervision, and medical care policy. Plaintiffs assert that Riley's written policy lacked suicide prevention measures; that jail officers had not seen the written policy; that policies were not reviewed after past attempted suicides; that there were no provisions for staff training, intake

screening and assessment, or referral; and that there was no adequate provision for safe housing and levels of observation. Plaintiffs argue that a written policy is fundamental to running the jail.

A sheriff who does not personally participate in the offensive conduct may still be liable if the sheriff implements a policy that repudiates the plaintiff's constitutional rights. *Thompkins*, 828 F.2d at 304. The sheriff "cannot be held liable unless he knew the jail's system was so deficient as to expose prisoners to substantial risk of significantly unmet serious medical needs -- i.e., was unconstitutional -- and failed to properly attempt to correct it" and the sheriff's act or omission caused the Plaintiff's injuries. *Id.* Like the failure to train, an unconstitutional policy "cannot be inferred from a single wrongful act." *Id.*

Plaintiffs have failed to show that the policy which defendant Thompson knew but did not act upon was a "repudiation" of Allen's rights. One written and several verbal policies existed to deal with suicide threats at DeSoto County Jail. Defendant Thompson observed Allen for approximately two hours and medically screened Allen during the booking process. Based on her personal observations, Thompson decided not to implement a known but unwritten suicide policy by which an officer would have placed Allen on a fifteen minute watch, taken away her personal items, and dressed her in a yellow jumpsuit. Thompson was cognizant of the actions to take once a suicide watch was enacted; she just chose not to trigger the suicide protocol.

As quoted above, Thompson testified in her deposition that, had she been adequately warned of the risk that Allen would commit suicide, she would have taken the following steps:

A: If I had been informed that she was a suicide risk, the supervisor would have been notified, and he would have made – he or she would have made that determination on what needed to be done.

Q: Okay. And do you know, if you had so informed the supervisor, what the policies and procedures were in place as of that night for dealing with somebody who may attempt to kill themselves?

A: Most likely they would have been put on a fifteen-minute watch, and they would have been checked every fifteen minutes. All their items would have been taken from them, and they would have been dressed out in yellows.

The court finds this testimony to be very helpful to Riley in asserting his qualified immunity defense, and it will likely prove helpful to the county as well in defending against the failure to train claims asserted against it. Indeed, it seems likely that confiscating Allen's personal items, standing alone, would have prevented her suicide in this case, and Thompson's testimony indicates that she had been trained to do so. Thompson's testimony therefore constitutes a very serious hurdle for plaintiffs to overcome in seeking to argue that the training provided to county officers in this case was so deficient as to amount to a constitutional violation.

Furthermore, plaintiffs fail to demonstrate "a pattern of similar violations . . . that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge*, 336 F.3d at 370 (*quoting Thompson*, 245 F.3d at 459). To constitute an unconstitutional policy, there must be a "pattern of violations." *See Thompson*, 245 F.3d at 459. Although plaintiffs cite prior instances of suicide, they do not demonstrate how these suicides were caused by an unconstitutional policy. Although there were four prior suicides in the jail, at least twenty-three suicides were prevented. These numbers indicate that the existing policy has succeeded more than it has failed in the past. Finally, although plaintiffs argue that a written suicide policy is fundamental to jail operations, the court noted in *Talib v. Gilley*, 138 F.3d 211, 215 (5th Cir.

1998), that the validity of a prison policy is not determined by whether the policy is written or verbal.

Finally, the court emphasizes that, by electing to proceed against Riley individually, plaintiffs are sailing into the headwinds of the very stringent qualified immunity jurisprudence. As noted previously, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," and plaintiffs are unable, based upon the facts discussed above, to make such a showing as to their claims against Riley individually. The court will therefore grant Riley's qualified immunity motion as to the claims asserted against him in his individual capacity, and it will reserve consideration of any official capacity claims against him (that is, against the county itself) for a later date.

## CONCLUSION

In light of the foregoing, the court finds that defendants Roach, Davis, and Riley are entitled to qualified immunity, and as such, their motions [88, 92] for summary judgment are GRANTED. The court finds that defendant Thompson is not entitled to qualified immunity. Thompson's motion [110] for summary judgment is therefore DENIED.

This 5th day of July, 2012.


**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**